17 A.3d 850 (2011)
419 N.J. Super. 538
NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, Plaintiff-Appellant,
v.
A.R., J.R., and W.B., Defendants, and
J.H., Defendant-Respondent.
In the Matter of N.R., I.R., and J.H., Minors.
No. A-3161-10T4.
Superior Court of New Jersey, Appellate Division.
Argued April 14, 2011.
Decided May 10, 2011.
*851 Jessica M. Steinglass, Deputy Attorney General, argued the cause for appellant (Paula T. Dow, Attorney General, attorney; Andrea M. Silkowitz, Assistant Attorney General, of counsel; Lindsay Puteska, Deputy Attorney General, on the brief).
Christopher A. Ekeocha, Designated Counsel, argued the cause for respondent J.H. (Yvonne Smith Segars, Public Defender, attorney; Mr. Ekeocha, on the brief).
James A. Louis, Deputy Public Defender, argued the cause for minors (Yvonne Smith Segars, Public Defender, Law Guardian, attorney; Mr. Louis, of counsel and on the brief).
Before Judges CUFF, FISHER and SAPP-PETERSON.[1]
The opinion of the court was delivered by
FISHER, J.A.D.
We granted leave to review the trial judge's interlocutory determination that J.H. (defendant) did not abuse or neglect his ten-month old son, J.H. (hereafter James, a fictitious name), by placing him on a twin bed without rails late at night with a sleeping ten-year old child, A.T. (hereafter Anna, a fictitious name).[2] As a consequence of what defendant concedes was his negligence, James was found by Anna early the next morning on the floor and against a hot radiator, incurring severe burns to his right cheek, left arm, and skull. Defendant argued, and the trial judge agreed, that his conduct did not meet the gross negligence standard applied in actions seeking a determination of abuse or neglect pursuant to N.J.S.A. 9:6-8.21(c). See G.S. v. Dep't of Human Servs., 157 N.J. 161, 178, 723 A.2d 612 (1999). We granted leave to appeal and now reverse.

I
On October 28, 2010, a hearing took place for the purpose of determining whether defendant abused or neglected James within the meaning of N.J.S.A. 9:6-8.21(c). The Division presented the testimony of two Division caseworkers and other evidence that revealed the following basic facts.
On March 30, 2010, after going out to dinner, defendant, Victoria, and other family members, including James, returned to Victoria's apartment at approximately 11:00 p.m. The other children were put to bed and James was left in his car seat, *852 which was carried into and left in a bedroom with the door slightly ajar.
Defendant and Victoria remained up, sitting on a couch in the living room; according to Victoria, she and defendant "talked and flirted . . . kissing and stuff life that." At approximately 2:00 a.m., when James began to cry, defendant carried himstill in the car seatto the living room. Later, defendant took James out of the car seat and placed him on a bed in the bedroom with Anna, who was asleep. The twin bed had no rails, and Anna was not awakened nor told James was in the bed with her. After placing James on the bed, defendant closed the door and returned to the living room.
Sometime after 6:00 a.m., Anna awoke and told defendant and Victoria there was "something[] wrong with the baby," who she found on the floor against a hot radiator. James was taken to the hospital to be treated for his burns; the third-degree burn to James's head was described as being "all the way down to his skull."
Defendant neither testified nor called any witnesses, leaving these facts undisputed. The Family judge concluded that although defendant was negligent, he was not grossly negligent, and he did not act with reckless or wanton disregard for the child's safety. The judge recognized that defendant "exercised very poor judgment, putting the child on the bed with nothing to prevent the child from falling off the bed, other than a blanket." He observed that a child of this age should be in a bed with "little bumpers and little railings and things" to prevent the child from falling but concluded that the act of placing the ten-month old James on a bed without such safety precautions was "not gross and willful conduct, and [was] certainly not conduct that implies a person has acted with reckless disregard for the safety of others." Instead, in the judge's view, this was merely "common ordinary negligence" falling short of the statutory definition of an "abused or neglected child."
On October 28, 2010, an order was entered that memorialized the judge's determination. On November 17, 2010, the Division, joined by the Law Guardian, moved for reconsideration based on the fact that defendant had pled guilty to fourth-degree child neglect, pursuant to N.J.S.A. 9:6-1 and -3, on October 12, 2010.
A judgment of conviction in the criminal matter was entered on December 13, 2010, and the Family judge heard argument on the motion for reconsideration the next day. The judge determined that reconsideration was inappropriate because the guilty plea was something the Division should have been aware of at the time of the fact finding hearing. He also concluded that the statements made by defendant when entering the guilty plea were consistent with the facts adduced at the fact finding hearing in this action and that the guilty plea was not a concession of gross negligence. We granted the Division's motion for leave to appeal.

II
We agree that the judge's view of the timeliness of the Division's presentation of the judgment of conviction, by way of its motion for reconsideration, was somewhat parsimonious considering a child's well-being was involved. We need not, however, consider that point further. The matter rightfully turns on the conclusion to be drawn from the undisputed facts established at the fact finding hearing that were not contradicted when defendant pled guilty to a criminal offense arising from the same conduct.[3]
*853 So viewed, we start by rejecting defendant's argument that the judge's findings are entitled to our deference. The facts presented by the Division were undisputed, and the judge's determination that defendant was negligent but not grossly negligent is a conclusion of law to which we are not required to defer. See Manalapan Realty v. Twp. Comm. of Manalapan, 140 N.J. 366, 378, 658 A.2d 1230 (1995) (holding that "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference"); see also Estate of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 382-83, 997 A.2d 954 (2010); City of Atlantic City v. Trupos, 201 N.J. 447, 463, 992 A.2d 762 (2010).
In this matter, the Division was required to demonstrate by a preponderance of the evidence that James was an "abused or neglected child" within the meaning of N.J.S.A. 9:6-8.21(c) that, in part, is defined as a child whose parent or guardian inflicts or allows to be inflicted upon the child physical injury "by other than accidental means" due to the parent or guardian's failure "to exercise a minimum degree of care." The G.S. Court determined that the former quoted phrase refers to the circumstances preceding the accident and held that "[w]here an action is deliberate, and the actor can or should foresee that his conduct is likely to result in injury, as a matter of law, that injury is caused by `other than accidental means.'" 157 N.J. at 175, 723 A.2d 612. As the Court further explained:
"[I]f an intentional act produces an unintended result[,]" the injury is not accidental. A parent or guardian can commit child abuse even though the resulting injury is not intended. DYFS and the courts must examine the circumstances leading up to the injury to determine whether it was caused by accidental means. The intent of the parent or guardian is irrelevant.
[Ibid.; see also N.J. Div. of Youth & Family Servs. v. P.W.R., 205 N.J. 17, 32, 11 A.3d 844 (2011); N.J. Div. of Youth & Family Servs. v. M.C., III, 201 N.J. 328, 344, 990 A.2d 1097 (2010).]
The undisputed facts demonstrate that defendant's actions in placing James, a ten-month old child, on a twin bed without railings, next to an operating radiator, and with another sleeping child were deliberate, and the events that followedalthough not intended by defendantwere not brought about by accidental means.
Of course, as the G.S. Court recognized, not every physical injury caused "by other than accidental means" falls within the parameters of N.J.S.A. 9:6-8.21(c). In considering what it means to fail "to exercise a minimum degree of care," the Court rejected both the Division's argument that "simple negligence" would suffice and the defendant's argument that "a willful or purposeful intent" is required. 157 N.J. at 177, 723 A.2d 612. Instead, the Court held that the phrase "was chosen to capture a middle standard" and "refers to conduct that is grossly or wantonly negligent, but not necessarily intentional," id. at 177-78, 723 A.2d 612, explaining:
Conduct is considered willful or wanton if done with the knowledge that injury is likely to, or probably will, result. Because risks that are recklessly incurred are not considered unforeseen perils or accidents in the eyes of the law, actions *854 taken with reckless disregard for the consequences also may be wanton or willful. So long as the act or omission that causes injury is done intentionally, whether the actor actually recognizes the highly dangerous character of her [or his] conduct is irrelevant. Knowledge will be imputed to the actor.
[Id. at 178, 723 A.2d 612 (citations omitted).]
Whether a child is "abused or neglected" is quite frequently "fact sensitive." P.W.R., supra, 205 N.J. at 33, 11 A.3d 844. But the facts, as we have already noted, were not disputed. The simple question is whether defendant's deliberate actions in placing James in the precipitous position revealed by the record represented a reckless disregard for their consequences.

III
Whether a particular event is to be classified as merely negligent or grossly negligent defies "mathematical precision." G.S., supra, 157 N.J. at 178, 723 A.2d 612. The Court, however, provided this useful guide: "Where an ordinary reasonable person would understand that a situation poses dangerous risks and acts without regard for the potentially serious consequences, the law holds him responsible for the injuries he causes." Id. at 179, 723 A.2d 612. Certainly, it is a truth universally acknowledged that leaving an infant unattended in a filled bathtub constitutes gross negligence. In contrast, we have found that a mother was not grossly negligent when she permitted her four- and six-year old children to walk from a playground to "a home that was within [her] view" so one child could change his wet clothes from a water fight and the other could use the bathroom. N.J. Dept. of Youth & Family Servs. v. J.L., 410 N.J.Super. 159, 161, 168, 980 A.2d 488 (App.Div.2009). Although the mother had instructed the children to leave the door ajar, the door closed and "[b]ecause the front inside door knob was equipped with a child-proof cover," the children were unable to open it; they panicked, and the older child telephoned 9-1-1. Id. at 161-62, 980 A.2d 488. We concluded the mother was not grossly negligent and, in fact, recognized that the circumstances revealed the older child "was well trained by his parents to deal with the crisis that he perceived to exist." Id. at 169, 980 A.2d 488.
This case, like G.S., presents circumstances somewhere between the extremes of an unattended infant in a filled bathtub and the facts in J.L. In G.S., a child's caregivera worker at a facility for the mentally retardedupon opening a bottle of medicine prescribed for the child "was unsure how much she was supposed to administer." 157 N.J. at 182, 723 A.2d 612. Rather than calling the child's mother or a pharmacy for clarification, the caregiver administered the entire bottle of medication, ibid., a dosage seventy-eight times the prescribed amount, id. at 166, 723 A.2d 612. The Court explained:
That conduct clearly rises to the level of wanton or willful. Intelligent adults understand the grave dangers associated with prescription medication. As a medication administrator, G.S. should have been particularly sensitive to the dire consequences that could result from over-medicating a child. Even though she did not intend harm to befall [the child], she utterly disregarded the substantial probability that harm would result from her actions.
[Id. at 183, 723 A.2d 612.]
In determining where the case at hand may be found on the continuum suggested by these examples, we reject the conclusion reached by the trial judge that defendant *855 was merely negligent and not grossly negligent.
Defendant intentionally placed James on a twin bed without rails and closed the door behind him. There is some evidence in the record to suggest that defendant positioned blankets on the bed[4] as a means of preventing the child from falling either through the child's own actions or as a result of the inadvertent actions of another sleeping child. An ordinary reasonable person would understand that leaving the child in these circumstances, behind a closed door, posed a grave risk. If anything, defendant's alleged unsuccessful attempt to create a blanket buffer between the child and the bed's edge demonstrates he recognized the inherent danger to the ten-month old child in sleeping on a bed without rails near a radiator.[5] We conclude that "an ordinary reasonable person" would understand the perilous situation in which the child was placed, and for that reason, defendant's conduct amounted to gross negligence and supports the Division and Law Guardian's contention that the child was abused or neglected within the meaning of N.J.S.A. 9:6-8.21(c).
The order under review is reversed and the matter remanded for the entry of an order in conformity with this opinion. We do not retain jurisdiction.
NOTES
[1] Judge Sapp-Peterson did not participate at oral argument but was joined to the panel for disposition of this appeal with the parties' consent.
[2] A.R. is the mother of James; she is not a party to this action. Defendant and V.H. (hereafter Victoria, a fictitious name) are the parents of one child, N.H., who is eight years old. Victoria is also the mother of Anna.
[3] Defendant's statements at the plea hearing do not conflict with the Division's proofs. During the very brief hearing, defendant acknowledged he placed the child on a bed "without a safety rail," "should have foreseen that something could have happened" to the child, and did not "keep an appropriate eye [on the child] to prevent" him from falling off the bed.
[4] As noted earlier, defendant did not testify and, thus, provided no explanation. The fact that he may have placed blankets on the bed so James would not fall comes from the police report admitted in evidence at the fact finding hearing.
[5] The record supports the contention that, although this was not defendant's apartment, he was aware of the presence of the radiator. The record is not clear as to whether he understood the radiator was hot, but the judge's findings suggest that he thought it was reasonable to assumedue to the time of yearthat defendant should have known the heat in the apartment was on. Although it was the hot radiator that caused the child's injuries, obvious danger lurked in the potential for the child to roll off the bed. That the radiator was hot and caused the serious injuries suffered by the child only enhanced the inherently dangerous undertaking.