RECORD IMPOUNDED

 NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-2563-15T3

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

 Plaintiff-Respondent,

v.

L.L.,

 Defendant-Appellant,

and

J.N., Sr.,

 Defendant.
_________________________________________

IN THE MATTER OF B.N., J.N., Jr. and
J.N., minors.
_________________________________________

 Submitted May 31, 2017 – Decided July 20, 2017

 Before Judges Suter and Grall.

 On appeal from the Superior Court of New
 Jersey, Chancery Division, Family Part,
 Middlesex County, Docket No. FN-12-86-15.

 Joseph E. Krakora, Public Defender, attorney
 for appellant (Mary Potter, Designated
 Counsel, on the brief).
 Christopher S. Porrino, Attorney General,
 attorney for respondent (Melissa H. Raksa,
 Assistant Attorney General, of counsel;
 Arielle E. Katz, Deputy Attorney General, on
 the brief).

 Joseph E. Krakora, Public Defender, Law
 Guardian, attorney for minors (Noel C.
 Devlin, Assistant Deputy Public Defender, of
 counsel and on the brief).

PER CURIAM

 Following a fact-finding hearing, the judge determined the

Division of Child Protection and Permanency (Division)

established L.L. neglected her three sons by failing to exercise

a minimum degree of care in supervising them. N.J.S.A. 9:6-

8.21(c)(4)(b), -8.44, -8.46(b).1 L.L. appeals and argues the

Division failed to establish imminent danger or substantial risk

of injury to her sons' physical, mental or emotional condition.

For the reasons that follow, we reverse.2

 The Division removed the boys from L.L.'s care in the early

hours of August 14, 2014, pursuant to N.J.S.A. 9:6-8.29 and

1
 Initials are used to maintain confidentiality consistent with
Rule 1:38-3(d)(12); the hearing was conducted on December 12,
2014, and the judge issued a written opinion and order on April
15, 2015.
2
 L.L. also urges us to reverse because she was not the
children's primary caretaker. Her argument on that point has
insufficient merit to warrant discussion in a written opinion.
R. 2:11-3(e)(1)(E).

 2 A-2563-15T3
-8.30. L.L.'s first son, B.N., was twelve years old; her second

son, Ju.N., was nine; and her third son, Jo.N., was four. Where

necessary to distinguish among L.L.'s sons, we refer to them as

the first, second or third son, based on date of birth.

 I.

 During the December 12, 2014 fact-finding hearing, the

testimony of two Division employees, Thomas Josil, the family's

caseworker, and Latia Williams, who removed the children, was

presented. Additionally, photographs and documentary evidence

were admitted into evidence. L.L. did not testify or present

any witness or documentary evidence.

 In April and May 2014, the Division received, investigated

and determined that three referrals alleging abuse and neglect

were all unsubstantiated or not established. Nevertheless, the

Division asked L.L. and her sons' father, J.N., Sr., to undergo

evaluations for substance abuse. L.L. agreed and complied.

J.N., Sr., who was on parole, also agreed, but he left his

family and moved to Texas.

 L.L. was evaluated by Catholic Charities - CPSAI Group on

June 23, 2014. L.L.'s drug test was positive for

opiates/morphine, and that result was not explained by L.L.'s

use of prescribed benzodiazepines, Xanax and Ambien. The intake

counselor identified psychological and environmental problems

 3 A-2563-15T3
L.L. faced including: the loss of her cash benefits from

welfare, inability to pay rent, recent break-up with her

children's father and the Division's involvement with her

family. She recommended out-patient treatment with the Center

for Great Expectations (Center), and L.L. went to the Center for

an intake interview on July 30, 2014.

 Following L.L.'s intake interview, the counselor contacted

Josil because she thought L.L. was under the "influence."

Although L.L. kept the appointment, she could not complete the

process because she was "nodding off," slurring her words, and

unable to hold a pen or provide a urine sample.

 Josil went to L.L.'s home on July 31. L.L. was able to

communicate without slurring her words and exhibited no signs of

intoxication. Although her apartment was "in disarray" (clothes

and toys all over and food in the kitchen sink), Josil told L.L.

"to clean up," and she complied.

 L.L.'s mother, R.L., was present. Because of the Center's

report and prior referrals alleging L.L.'s abuse of substances,

Josil prepared a "safety protection plan" (SPP), which L.L. and

R.L agreed to and signed.

 The SPP listed two safety issues: L.L.'s "use and abuse of

prescription medications" and "emotional instability." The SPP

identified "specific safety action[s]" to address those issues.

 4 A-2563-15T3
Regarding "emotional instability," L.L. agreed to "attend mental

treatment and undergo medication monitoring," and the Division

agreed to "supervise." Regarding substance abuse, L.L. agreed

to, "refrain from using and abusing prescription medications";

her mother R.L. agreed to "supervise and monitor" L.L.'s

children "at all times"; and, the Division agreed to

"supervise." As Josil testified, R.L. was obligated to

supervise L.L. at home with the children, not to serve as her

grandsons' primary caregiver. The SPP does not mention the

condition of L.L.'s apartment, because L.L. had addressed the

disarray Josil observed.

 The SPP does not address L.L.'s financial difficulty

either. It is not clear Josil was aware of L.L.'s finances on

July 31, but he knew about it by August 5, 2014, when he

reviewed and signed the report from Catholic Charities, which

noted her loss of cash welfare benefits. At 10:00 a.m. on

August 13, Josil went to L.L.'s home and brought L.L. "to

Welfare." He did not go inside the apartment that day.

 On the same day, August 13, at 10:45 p.m., the Division

received the referral that led to the children's removal.

According to the screener's summary, the caller ("reporter")

advised that R.L., who was supposed to be supervising L.L. and

her children, had "asked [her] for a ride home [that] evening."

 5 A-2563-15T3
The reporter explained: "the children are out of control and

the grandmother could not take it anymore"; "there is no

electricity in the home [, and L.L.] is running a wire from a

neighbor's home." Although the reporter had not been inside the

apartment for a week, she reported that it was filthy, with

rotting food in the refrigerator and dishes in the sink. The

reporter also stated L.L. did laundry once a month and was being

evicted on August 27.3

 Latia Williams, a family service specialist for the

Division, arrived at L.L.'s apartment to investigate the

referral at about 2:00 a.m. on August 14. On Williams's

arrival, L.L. was "reluctant" to let her in and explained that

her sons were sleeping and her house was "messy." When Williams

entered, the boys were in fact asleep and the apartment was

indeed messy.

 To document her observations, Williams photographed L.L.'s

three sons asleep on a sofa bed in the littered living room.

There were wires protruding from the sofa bed, which Williams

acknowledged were not shown in the photographs. Apart from

3
 The caller did not testify at the fact-finding hearing; the
screener's summary of the call was in evidence for the limited
purpose of explaining the Division's early morning visit.

 6 A-2563-15T3
stating that the wires were from the bed and not electrical,

Williams did not describe the wires.

 To Williams, L.L. "appeared to have slurred speech" and her

affect was "flat." L.L. denied being under the influence and

said she had taken her prescribed Xanax at 8:00 p.m. Based on

her observations, Williams could not "confirm" that L.L. was

under the influence. However, Williams did notice "marks" on

L.L.'s arms that "appeared to be marks you would have if you

were" injecting drugs, "like track marks." According to

Williams, L.L. told her the marks on her arms were from her

sleeping on the sofa bed with the exposed wires.

 L.L. was using electricity from a neighbor, a refrigerator

in the kitchen was leaking and "wires were actually in the leaky

water that was [seeping] into the carpet." Using the

photographs she took, Williams pointed out the extension cord

conveying electricity from her neighbor's home that was crossing

a dark spot on the floor, which was water leaked from the

refrigerator. There was no evidence, testimonial or

photographic, suggesting the extension cord was worn or

unsuitable for outdoor use.

 Williams noted other problematic features. There was an

unwrapped sandwich on a littered kitchen table. Williams did

not know how long the sandwich had been there and was concerned

 7 A-2563-15T3
because it was uncovered. There were also photos of a dirty

bathroom with dirty fixtures.

 Photographs of one bedroom showed it had one bed with a

bare mattress. A disconnected air conditioner, trash and

clothing were on the floor. Pictures of a second bedroom showed

a bunk bed, with a bare mattress and a pile of clothing on the

lower bunk and a mattress on the upper bunk, which was covered

with a sheet that had a pair of folded pants and balled up

fabric on top of it. None of the pictures showed furniture that

could be used to hold clothing, papers or other belongings.

 Josil was shown the photographs of the apartment during his

testimony. Although he had been to L.L.'s apartments several

times before August 14, he had not seen it in the condition

depicted. In his words, the pictures showed the home "at its

worst."

 Williams asked L.L. about the children's medical/emotional

conditions. L.L. accurately reported that her first son had a

diagnosis of ODD/ADHD. Her first son reported, and L.L

confirmed: the third son went to bed with a bottle; the second

and third son both wet their beds at times; and, the third son

sometimes used a diaper at night. No evidence linking the

children's conditions to parental neglect was presented.

 8 A-2563-15T3
 The children were given physical examinations following

their removal. Their respective immunizations were current, and

there were no indications of abuse or of problems attributable

to poor hygiene. However, the children were not problem free.

The third son was found to have speech delays, a stutter and

irregular eye movement. A dental exam was recommended, not to

address decay or infection, but to determine whether he needed

care because of his prolonged use of a bottle.

 Williams identified the following reasons for removing the

children during the early hours of August 14: R.L.'s departure

violating the SPP; L.L.'s slurred speech and flat affect; and

the apartment's deplorable condition. Williams admitted she did

not know whether L.L. had the funds to remedy the sofa bed and

was aware that R.L. left of her own accord, not at L.L.'s

request and despite L.L.'s first son urging R.L. to stay.

 L.L. was still struggling with drug addiction on August 14.

A letter from the Center for Great Expectations dated September

5, 2014 reports L.L. "engaged in treatment on [August 5, 2014]

and attends the IOP group on Mondays, Tuesdays and Thursdays"

and "demonstrates motivation for treatment" by her "consistent

attendance." Noting her positive drug tests, including a test

on August 14 disclosing benzodiazepines and opiates, the

Center's letter advises it is "evaluating" whether L.L.'s

 9 A-2563-15T3
prescribed benzodiazepines are "the best medication to manage

her symptoms of anxiety and depression as well as her substance

use disorder diagnosis." The Center noted L.L. is "struggling

with sobriety and presents with an inability to achieve

abstinence at this level of care."

 L.L.'s children were not in her custody or care between

their removal and the fact-finding hearing, and L.L. had not

resolved her substance abuse when the hearing commenced. A

letter from the Primary Clinician for the Center dated October

28, 2014, just short of two months before the hearing, described

L.L.'s effort and failure. L.L. had completed a detoxification

(detox) program on September 21, 2014, but she continued to

submit samples testing positive for opiates (one positive for

heroin as well) and was "not actively seeking inpatient

treatment independently of [the Center]." In the closing

paragraph, as it had in its September letter, the Center

explained:

 [L.L.] is currently struggling with
 sobriety and presents with an inability to
 achieve abstinence at this level of care.
 Therefore, I am recommending that she
 complete a Level III. 7 [inpatient] short
 term rehab program. [L.L.] may return to
 CGE Outpatient treatment once she completes
 short term [inpatient] treatment.

 10 A-2563-15T3
 At the hearing, Josil testified to L.L.'s participation in

a seven-day detox inpatient program and her continued, regular,

daily and unsuccessful phone calls to obtain a spot for

inpatient treatment.

 II.

 The judge credited Williams's and Josil's testimony. He

found that L.L. was subject to and violated the SPP when her

mother left her unsupervised with her children for over three

hours, "and likely longer since her mother left during the

'day.'" He concluded L.L. should have but failed to immediately

contact the Division when R.L. left, and that L.L. knew R.L.'s

departure "would likely result in the children's removal." The

judge further found L.L.'s drug abuse remained unabated, as

evidenced by the positive test on August 14. He also found that

L.L. exposed her sons to a risk of danger by allowing them to

sleep on the sofa bed when she knew the bed's wires injured her.

 The judge wrote: "Here, the evidence when considered

appropriately in context establishes that [L.L.], with an active

substance abuse problem, was caring for her minor children

unsupervised and in violation of a SPP." In a footnote

accompanying the preceding sentence, the judge explained that he

was not relying "exclusively on . . . [L.L.'s] slurred speech

and flat affect," but on "the combination of her active

 11 A-2563-15T3
substance abuse problem, lack of appropriate supervision and

active risks to the children[.]"

The judge further wrote:

 The violation of that SPP was known to
 [L.L.] both by her admission and her [first]
 son's actions [presumably referring to that
 son's attempt to get R.L. to return] on
 August 13, 2014. In violation of the [SPP],
 the trial evidence does not establish that
 she made any attempt to contact the Division
 or seek other appropriate care for her
 children that day or night after her mother
 left the home. On the night of removal, her
 speech was slurred, and she had a flat
 affect. Later testing confirmed her active
 drug use on August 14, 2014, the date of the
 removal. The condition of the home was
 indisputabl[y] deplorable and contained
 general and specific dangers to the
 children. Most notably the admitted
 projection of "wires" from the sofa [bed]
 where the children were sleeping and which
 wires were stated to have caused injury to
 [L.L.]. Her unauthorized supervision of her
 children, with an active drug problem,
 subjected her children to the dangerous
 conditions of the home, including harmful
 wires protruding from the bedding and
 extension cords traversing through wet and
 damp conditions, when combined, in toto,
 supports a finding that [L.L.] was grossly
 negligent and acted with a reckless
 disregard for the safety of her children,
 thereby exhibiting a failure to exercise a
 minimum degree of care in their supervision.
 Such failure placed the children at
 substantial risk of harm.

 In reaching the determination, the
 [c]ourt considered whether [L.L.] could have
 performed some act to remedy the situation
 or remove the danger understanding that not

 12 A-2563-15T3
 every failure constitutes abuse or neglect.
 Here [L.L.'s] failures to act were numerous.
 First, she was caring for her children
 without an appropriate supervisor while
 knowingly violating a [SPP] and while she
 had an active substance abuse problem. Her
 inability to properly supervise was
 evidenced by the dangerous conditions of the
 home and the specific decision to permit the
 children to sleep on a bed with exposed
 wires that caused injury to herself.

 In evaluating the totality of the
 circumstances, the [c]ourt also considered
 [Josil's testimony that the apartment was at
 its worst on August 14.] It is a reasonable
 conclusion, based on this testimony, that
 the situation in the home and the
 circumstances that led to the Division's
 involvement were getting worse. In sum, that
 [L.L.] and any supervisor were not
 addressing the situation. She still had an
 active drug issue. The home environment was
 devolving[,] and she placed her children in
 a situation where they were at risk of harm
 due to the sleeping conditions and other
 risks in the home, at a minimum.

 . . . .4

 Finally, it should be noted that the
 [c]ourt reviewed all the trial evidence in
 its appropriate context and concludes its
 decision here is not based on [L.L.'s]
 economic or social circumstances . . . .
 Rather, the [c]ourt's decision is based on
 the actions and decisions of [L.L.] when she
 placed her chid[ren] in substantial risk of
 harm while acting as a caretaker in
 violation of a safety protection plan

4
 The judge's rejection of L.L.'s argument that her mother was
solely responsible under the SPP is omitted, because that claim,
which she repeats on appeal, has insufficient merit to warrant
discussion in this written opinion. R. 2:11-3(e)(1)(E).

 13 A-2563-15T3
 without an appropriate supervisor. She was
 observed to have a flat affect and slurred
 speech. [L]ater testing confirmed that on
 the day of the removal, she tested positive
 for opiates. Most critically, the condition
 of the home as previously detailed, and the
 decision to place the children in a bed with
 exposed wires — which had caused injury to
 her — was, in the totality of the
 circumstances, grossly negligent. In this
 regard, it is important to note that there
 were a number of beds in the home . . . .
 [None] contained a dangerous condition such
 as the bed in which all three children were
 permitted to sleep. As such, any claim that
 the children sleeping on the sofa bed was a
 result of [L.L.'s] inability to purchase
 another bed or sofa is misplaced as there
 were other options available in the home for
 the children to sleep in a setting safer
 than that selected by [L.L.].

 III.

 Our standard of review is deferential. In recognition of

the special expertise of Family Part judges in matters of

parental abuse and neglect, this court defers to findings

supported by substantial credible evidence in the record. N.J.

Div. of Youth & Family Servs. v. L.L., 201 N.J. 210, 226 (2010).

In evaluating the sufficiency of the credible evidence, "Judges

at the trial and appellate level cannot fill in missing

information on their own or take judicial notice of harm.

Instead, the fact-sensitive nature of abuse and neglect cases,

turns on particularized evidence." N.J. Div. of Youth & Family

Servs. v. A.L., 213 N.J. 1, 28 (2013) (citation omitted).

 14 A-2563-15T3
Nevertheless, we intervene to ensure fairness if the judge's

"conclusions are 'clearly mistaken or wide of the mark.'" L.L.,

supra, 201 N.J. at 227 (quoting N.J. Div. of Youth & Family

Servs. v. E.P., 196 N.J. 88, 104 (2008)). Moreover, our

deference does not extend to a "trial court's interpretation of

the law and the legal consequences that flow from established

facts[.]" Manalapan Realty, L.P. v. Twp. Comm., 140 N.J. 366,

378 (1995); accord N.J. Div. of Youth and Family Servs. v. R.G.,

217 N.J. 527, 552 (2014) (quoting Manalapan in a case involving

termination of parental rights).

 The judge in this case relied, in part, on this court's

decision in New Jersey Division of Child Protection and

Permanency v. M.C., 435 N.J. Super. 405 (App. Div.), which was

pending before the Supreme Court on a grant of certification at

the time of his decision, 220 N.J. 41 (2014). After the judge

issued that opinion, the Supreme Court remanded M.C. "to the

Superior Court, Appellate Division for reconsideration in light

of the Court's recent opinion in Department of Children &

Families v. E.D.-O., 223 N.J. 166 (2015)." N.J. Div. of Child

Protec. & Permanency v. M.C., 223 N.J. 160 (2015).

 In E.D.-O., the Court rejected our reading of N.J.S.A. 9:6-

8.21(c)(4)(b) in M.C., which interpreted the same provision to

require an assessment of the "risk of harm to any child at the

 15 A-2563-15T3
time the complaint seeking care and supervision of her children

is heard or the Director renders a decision." E.D.-O., supra,

223 N.J. at 174-75. The Supreme Court explained its disapproval

of our reliance on circumstances as they are at the time of the

hearing in M.C.:

 The myriad dispositions available to the
 trial court after it enters a finding of
 abuse or neglect are fashioned based on
 current circumstances. For example, N.J.S.A.
 9:6-8.50(e) expressly permits a trial court
 to suspend a dispositional hearing
 indefinitely to permit the Division to
 report the current status of the parent and
 child and whether any further services or
 supervision are required.

 [Id. at 189-90.]

We review this case in light of E.D.-O..

 The Division alleged and the judge found neglect as defined

in N.J.S.A. 9:6-8.21(c)(4)(b).

 Title 9 defines an "abused or neglected
 child," in pertinent part, as

 a child less than 18 years of age
 . . . whose physical, mental, or
 emotional condition has been
 impaired or is in imminent danger
 of becoming impaired as the result
 of the failure of his parent or
 guardian . . . to exercise a
 minimum degree of care . . . in
 providing the child with proper
 supervision or guardianship, by
 unreasonably inflicting or
 allowing to be inflicted harm, or
 substantial risk thereof[.]

 16 A-2563-15T3
 [N.J.S.A. 9:6-8.21(c)(4)(b).]

 Accordingly, Title 9 initially looks for
 actual impairment to the child. However,
 when there is no evidence of actual harm,
 the focus shifts to whether there is a
 threat of harm. Thus, "a finding of abuse
 and neglect can be based on proof of
 imminent danger and a substantial risk of
 harm." Under those circumstances, "the
 Division must show imminent danger or a
 substantial risk of harm to a child by a
 preponderance of the evidence." Moreover,
 "[c]ourts need not wait to act until a child
 is actually irreparably impaired by parental
 inattention or neglect."

 [E.D.-O., supra, 223 N.J. at 178 (citations
 omitted).]

 With respect to "substantial risk of harm," the Court

explained: "Each determination of whether the conduct of a

parent or caretaker constitutes child abuse or neglect pursuant

to N.J.S.A. 9:6-8.21(c)(4)(b) requires a determination of

whether the child suffered actual physical, mental, or emotional

harm or whether the conduct exposed the child to an imminent

risk of such harm." E.D.-O., supra, 223 N.J. at 185 (emphasis

added). The risk required to establish neglect is "a risk of

serious injury to that child." Id. at 179 (quoting G.S. v.

Dep't of Human Servs., 157 N.J. 161, 181 (1999)).

 Addressing the showing required to prove a failure to

exercise a "minimum degree of care," the Court explained: "The

 17 A-2563-15T3
text of N.J.S.A. 9:6-8.21(c)(4)(b) is designed to capture

grossly negligent conduct that has harmed or poses a risk of

imminent harm to a child." Id. at 186 (emphasis added). Where

"[a]n ordinary reasonable person would understand the perilous

situation in which [a] child [has been] placed, . . . [a]

defendant's conduct amount[s] to gross negligence." Id. at 185

(quoting N.J. Div. of Youth & Family Servs. v. A.R., 419 N.J.

Super. 538, 546 (App. Div. 2011)). Alternatively, a parent

"fails to exercise a minimum degree of care when he or she is

aware of the dangers inherent in a situation and fails

adequately to supervise the child or recklessly creates a risk

of serious injury to that child." Id. at 175 (quoting G.S.,

supra, 157 N.J. at 181).

 To the extent the judge's finding of imminent danger or

substantial risk of harm rests on the sofa bed's wires, it is

not supported by credible evidence in the record. The only

basis for finding those wires dangerous is Williams's recitation

of L.L.'s explanation for the marks on her arms. Even though

the judge found Williams's testimony credible, the probative

value of L.L.'s explanation of the marks on her arms relevant to

danger of injury from the sofa bed's wires is dependent on the

reliability of L.L.'s statement, not the credibility of

Williams's testimony repeating what L.L. claimed. Nothing in

 18 A-2563-15T3
the record suggests that L.L.'s statement was anything other

than a creative explanation for what appeared to be "track

marks."

 Even if we were to assume adequate support for the judge's

determination that L.L.'s explanation for marks on her arms was

reliable, those injuries were minor, punctures resembling track

marks. If not caused by drug use, such "marks" are not injuries

of the sort "[a]n ordinary reasonable person would understand"

as "perilous." Id. at 185 (quoting A.R., supra, 419 N.J. Super.

at 546). Similarly, L.L.'s awareness of a risk of such minor

injury could not establish that she recklessly created an

imminent danger or a substantial risk of serious injury. Cf.

E.D.-O., supra, 223 N.J. at 185 (discussing A.R., supra, 419

N.J. Super. at 541, 543, 545-46, a case involving a father

placing his ten-month-old son to sleep, unattended for several

hours, on a twin bed without railings adjacent to a radiator hot

enough to burn him). Therefore, L.L.'s decision about the sofa

bed situation cannot support a finding of gross negligence or

recklessness. Id. at 175, 185.

 We recognize, as the judge did, that

 [w]hen determining whether or not a
 child has been abused or neglected, [courts'
 findings should be based] on the totality of
 the circumstances, since "[i]n child abuse
 and neglect cases the elements of proof are

 19 A-2563-15T3
 synergistically related. Each proven act of
 neglect has some effect on the [child]. One
 act may be 'substantial' or the sum of many
 acts may be 'substantial.'"

 [N.J. Div. of Youth & Family Servs. v. V.T.,
 423 N.J. Super. 320, 329-30 (App. Div. 2011)
 (emphasis added) (quoting N.J. Div. of Youth
 & Family Servs. v. C.H., 414 N.J. Super.
 472, 481 (App. Div. 2010), certif. denied,
 207 N.J. 188 (2011) (internal quotations
 omitted)).]

 Consideration of the totality of the circumstances,

however, must focus on the competent evidence. As previously

noted, "Judges at the trial and appellate level cannot fill in

missing information on their own or take judicial notice of

harm. Instead, the fact-sensitive nature of abuse and neglect

cases, turns on particularized evidence." A.L., supra, 213 N.J.

at 28 (citation omitted). Because the competent evidence did

not establish use of the sofa bed posed a danger, that situation

adds nothing that could raise other risks to the level of a

substantial risk of serious injury. By other risks we refer to,

L.L.'s failure to report R.L.'s sudden departure, her active

drug use, or use of an extension cord, not shown to be

unsuitable, by design or condition, for conveyance of

electricity.5

5
 L.L.'s use of the extension cord to convey electricity, unlike
the use of the bed, had to be considered in light of L.L.'s

 20 A-2563-15T3
 Before turning to L.L.'s failure to notify the Division of

her mother's departure, we stress that R.L.'s departure time was

not established. The summary of the 10:45 p.m. referral was not

admitted for the truth of what the caller said, and viewed in

context, the references to "day" and "that day" elsewhere in the

record are too ambiguous to permit an inference about the time

R.L. left L.L.'s apartment on August 13.

 L.L.'s failure to notify the Division after R.L. left her

apartment establishes neglect but not gross negligence. As

Josil explained, R.L.'s supervision was a cautionary measure

imposed because L.L.'s history of substance abuse.

 The Supreme Court emphasized in E.D.-O., "[f]ailing to

perform a cautionary act . . . is not necessarily abuse or

neglect." 223 N.J. at 180 (citing Dep't of Children & Families

v. T.B., 207 N.J. 294, 306-07 (2011)). In the totality of these

circumstances, R.L.'s sudden departure was "extenuating," and,

as such, had to be considered in determining whether L.L.'s

conduct was grossly negligent. Id. at 174. There was no

evidence establishing unreasonable delay; the children were

efforts to obtain assistance in meeting her bills, which was an
aspect of the situation relevant to the question of gross
negligence. The shut-off of power occurred despite her efforts,
and that was an extenuating circumstance that had to be
considered. E.D.-O., supra, 223 N.J. at 174.

 21 A-2563-15T3
asleep and the record does not permit a finding as to when R.L.

left. Moreover, despite L.L.'s slurring and flat affect when

Williams arrived at 2:00 a.m. on August 14, L.L. was fully aware

of the situation. She knew her children were sleeping and her

house was messy, and she was able to describe the event that led

to R.L.'s departure and her first son's diagnosis. While there

was evidence that she submitted to a drug test on August 14 that

was positive for her prescribed medication and un-prescribed

opiates, there was no expert evidence explaining what, if

anything, the drug levels present in her tested sample indicated

about the time of her drug use or her degree of impairment. See

A.L., supra, 213 N.J. at 28. "Addiction is not easy to

successfully remediate; a failure to successfully defeat drug

addiction does not automatically equate to child abuse or

neglect." V.T., supra, 423 N.J. Super. at 331. The evidence

did not establish that L.L. was impaired or took drugs knowing

she would be unsupervised.

 The judge found gross negligence based on L.L.'s awareness

of the risk the Division would likely remove her children if she

was unsupervised. L.L.'s awareness of that risk is clearly

supported by the record, but removal by the Division is not a

risk cognizable as gross negligence. As previously noted, a

failure to perform a cautionary act amounts to gross negligence

 22 A-2563-15T3
if a parent is aware of imminent danger or a substantial risk of

harm to a child's physical, mental or emotional condition. In

any event, L.L.'s notification of the Division about R.L.'s

departure would not have diminished the risk of removal.

 Alternatively, gross negligence can be shown by evidence

establishing a situation that an ordinary reasonable person

would recognize as perilous for a child. E.D.-O., supra, 223

N.J. at 175, 185.6 However, the judge did not determine that an

ordinary person in L.L.'s situation would recognize her failure

to notify the Division she was caring for the children without

supervision while continuing to struggle with addiction created

a risk of serious injury to the children. And, as the Court

explained in E.D.-O., "[i]n all but the most obvious instances,

that assessment must avoid resort to categorical conclusions."

Id. at 180.

6
 Removal by the Division is undoubtedly difficult for children.
But parental incapacity and the harm of separation that
accompanies it are pertinent to questions that arise when
termination of parental rights is at issue, and capacity to
parent, time needed to acquire or regain it and withdrawal of
parental attention in the interim are important. N.J.S.A.
30:4C-15.1(a)(1)-(4). In abuse and neglect proceedings, such
matters are addressed at disposition hearings. See E.D.-O.,
supra, 223 N.J. at 189-90.

 23 A-2563-15T3
 Because the Division failed to establish neglect pursuant

to N.J.S.A. 9:8-6.21(c)(4)(b), we reverse.

 Reversed.

 24 A-2563-15T3