## A97A1779. BOHANNON v. THE STATE.
(498 SE2d 316)

BIRDSONG, Presiding Judge.

A Tift County jury convicted appellant Mary Francis Bohannon of felony involuntary manslaughter, with reckless conduct as the unlawful act in support thereof, for causing the death of her two-month-old baby. The facts are as follows:

Both appellant and her co-defendant, the baby's father Joseph Turnbull, had severe drinking problems. Responding to a report of concern for the baby's welfare, a DFCS child abuse investigator visited appellant's home for a caseworker interview. During this visit, the caseworker drew up a "safety plan" designed to "reduce the imminent risk to the child or children that are in the home at the time"; included in the plan was an instruction for appellant to obtain babysitting when she intended to drink and an instruction for appellant to pick up the baby from the sitter only when she is sober and has not had a drink for 24 hours. After the DFCS worker had written up the safety plan and read it to her, appellant signed the plan, agreeing to the terms thereof. Appellant further admitted therein that she had an addiction to alcohol.

Less than two weeks later, appellant took a day trip to her brother's home on Pleasure Lake; Turnbull and a neighbor went with her. The baby was taken to a babysitter's home before the group left for the lake. Appellant and Turnbull consumed alcohol during the trip. Both became intoxicated. They returned from the lake at approximately 12:30 a.m. and stopped at the sitter's home to pick up the baby. Co-defendant Turnbull was intoxicated and was staggering. Although the evidence as to appellant's degree of sobriety is conflicting, there exists testimony that she also was drunk. The babysitter could tell the couple had been drinking and attempted to persuade appellant to leave the baby in her care.

Appellant and Turnbull brought the baby back to their home. Since her birth, the baby had slept with appellant and Turnbull in their bed. She had been sleeping on a pillow between Turnbull and appellant for over a week because a nurse practitioner had recommended the baby sleep on a pillow to aid the baby's respiration problems. After arriving home, appellant personally placed the baby

on the pillow between them in the middle of their bed even though she was aware that Turnbull was intoxicated, appeared to be "buzzing," and "disorient[ed]" and "high." The intoxicated couple went to sleep. In the night, the baby rolled off the pillow, Turnbull rolled over onto the baby, and the baby was asphyxiated during the overlay. *Held*:

1. The evidence of record is sufficient, under the standards of *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) to sustain appellant's conviction of involuntary manslaughter with reckless conduct serving as the underlying unlawful act.

(a) Appellant's expressed and implied contentions that OCGA § 16-5-60 (reckless conduct), as applied to her, failed to provide the requisite due process notice regarding the type of conduct prohibited and that the underlying offense of reckless conduct could not be proved as a matter of law due to vagueness of the statute (see generally *Hall v. State*, 268 Ga. 89 (485 SE2d 755)), were not timely raised in the trial court and have not been preserved on appeal. See *Newton v. State*, 259 Ga. 853, 854 (5), (6) (388 SE2d 698); *Arp v. State*, 249 Ga. 403 (1) (291 SE2d 495).

(b) "A person commits the offense of involuntary manslaughter in the commission of an unlawful act when he causes the death of another human being without any intention to do so by the commission of an unlawful act other than a felony." OCGA § 16-5-3 (a).

Further, " '[t]here can be no conviction of the offense of involuntary manslaughter, either in the commission of an unlawful act, or in the commission of a lawful act without due caution and circumspection, where the homicide is directly due to an independent intervening cause in which the accused did not participate and which he could not foresee. . . . To constitute a crime there must be either the joint operation of act and intention, or criminal negligence.' " *Thomas v. State*, 91 Ga. App. 382, 384 (85 SE2d 644); see OCGA § 16-2-1.

Reckless conduct is an unlawful act in this State and constitutes a misdemeanor offense. "A person who causes bodily harm to *or* endangers the bodily safety of another person by consciously disregarding a substantial and unjustifiable risk that his act or omission will cause harm *or* endanger the safety of the other person *and* the disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation is guilty of a misdemeanor." (Emphasis supplied.) OCGA § 16-5-60 (b).

"Thus, the crime of reckless conduct is, in essence, an instance of *criminal negligence*, rather than an intentional act, which causes bodily harm to or endangers the bodily safety of another." (Emphasis in original.) *Bowers v. State*, 177 Ga. App. 36, 38 (1) (338 SE2d 457). " 'Criminal negligence necessarily implies, not only knowledge of probable consequences which may result from the use of a given

instrumentality, but also wilful or wanton disregard of the probable effects of such instrumentality upon others likely to be affected thereby.' . . . 'Criminal negligence is something more than ordinary negligence which would authorize a recovery in a civil action. Criminal negligence as used in our Code is the reckless disregard of consequences, or a heedless indifference to the rights and safety of others, and a reasonable foresight that injury would probably result.' The intent referred to is, of course, not the intent to kill but the intent to commit the unlawful act which proximately results in the death of another." *Thomas*, supra at 384.

Moreover, at law "[e]very person concerned in the commission of a crime is a party thereto"; and "a person is concerned in the commission of a crime only if he," inter alia, "[d]irectly commits the crime." OCGA § 16-2-20 (a) and (b) (1).

The involuntary manslaughter indictment avers that appellant and Joseph Stanley Turnbull "did then and there, acting together as parties to the crime, unlawfully while in the commission of [r]eckless conduct, a misdemeanor cause the death of [a child] . . . less than 3 months of age, in that the accused caused the child's death while consciously disregarding a substantial and unjustifiable risk that their acts would cause harm and endanger the safety of [said child] in that the accused did, while in a drunken state, take the child from the safety of a babysitter and place the child in the bed with the accused and, in a drunken sleep, roll on top of the child thereby inflicting injuries to the child's head and asphyxiating her, such disregard by the accused being a gross deviation from the standard of care which a reasonable person would exercise in the situation. . . ." According to the averment, the substantial and unjustifiable risk which appellant and her co-defendant consciously disregarded was that of taking an infant *of less than three months old* from the safety of the babysitter, *while both accused were in a drunken state*, and placing the infant in the bed with them both.

On appeal the evidence must be viewed in the light most favorable to support the verdict, and appellant no longer enjoys a presumption of innocence; moreover, an appellate court determines evidence sufficiency and does not weigh the evidence or determine witness credibility. *Grant v. State*, 195 Ga. App. 463, 464 (1) (393 SE2d 737). Also, evidence admitted at trial by a witness subject to cross-examination thereon, regarding prior consistent or inconsistent statements being offered to bolster testimony where veracity is in issue or to impeach, respectively, is not limited in value merely to prove such matters but also constitutes substantive evidence of the matter asserted. Compare *Cuzzort v. State*, 254 Ga. 745 (334 SE2d 661) with *Gibbons v. State*, 248 Ga. 858 (286 SE2d 717).

The evidence viewed in a light most favorable to support the ver-

dict shows, inter alia, the following: Both appellant and her co-defendant had serious drinking problems; alcohol had control of the accused. Responding to a report of concern for the baby's welfare, on July 2, 1996, a DFCS child abuse investigator interviewed appellant. Appellant informed the investigator that she had a problem with alcohol, had been to Detox and to AA meetings but did not consider herself to be an alcoholic. The investigator had appellant execute a written safety plan, which is a device designed to reduce the "imminent risk" to a child in the home. The safety issue addressed in this plan was "[t]o insure the safety, health, and well being of [appellant's] child." As part of the plan, appellant agreed to acquire a reliable babysitter when she was going out drinking, and that she would "pick up her children and only when she is sober [and] hasn't had a drink for twenty-four hours." Appellant also admitted in the plan that she had an "addiction" to alcohol and agreed to work toward sobriety. The investigator read the safety plan terms to appellant and then had her read the terms and sign the plan. Appellant indicated she understood the plan and agreed to it; she did not have any questions regarding the terms of the plan.

On July 13, 1996, less than two weeks after executing the safety plan, appellant left her young baby with a babysitter; she subsequently went drinking with her co-defendant, a Mr. Gilliard and a man named Bill, at her brother's house. Subsequently, they left and went to retrieve the baby from the sitter. At this time the co-defendant was intoxicated and was staggering. Although the evidence as to appellant's degree of sobriety was conflicting, there exists testimony that appellant had consumed a six-pack of beer herself, and when she retrieved the baby from the sitter she smelled of alcohol and was drunk, although not staggering drunk. Appellant made an oral, recorded statement in which she admitted she had, at least, four drinks of Lord Calvert's whiskey and Coke that evening; each drink was free-poured into a sixteen-ounce cup. She made no admission to having drunk beer. She further admitted that she was under the influence of alcohol when she went to get her baby, although she denied being drunk; and she opined that her co-defendant who is an alcoholic "appeared buzzing," that is, he was disoriented and high at the time. Though the sitter offered to keep the baby because appellant and co-defendant noticeably had been drinking, appellant took the baby home. Appellant, by her own admission, then put the baby on a pillow "in the middle of us" in the bed, so that the baby was positioned between her and the co-defendant; a practice in which she had engaged since the baby was one month old.

Upon awakening the next morning, appellant could not locate the baby in the bed, so she went to Gilliard's trailer to inquire about it. Appellant informed Gilliard that she could not find her baby; she

asked him if they had left the baby at the sitter's and stated she believed either they had left the baby with the sitter or that the co-defendant had returned the baby to the sitter. Subsequently, Gilliard accompanied appellant back to her trailer to look for the baby; at the trailer, he obtained a beer from appellant's refrigerator. He heard appellant scream; either appellant or the co-defendant then entered the living room area holding the dead baby. The co-defendant had been lying on top of the baby in his sleep. The co-defendant started screaming that he had killed his baby. Appellant believes her baby's death might have been prevented if the co-defendant "hadn't been so intoxicated"; and with existing hindsight, she "wouldn't have been drinking to begin with," as "[she] feel[s] that might be a part of the reason" for the baby's death — "just because of alcohol." Appellant is aware that alcohol impairs hers and everyone's judgment.

The dissent would assert and we agree that the averred act of the co-defendant of rolling onto the baby, while being in a drunken sleep, is a part of the injurious result of the alleged act of reckless conduct. However, the act of criminal negligence giving rise to reckless conduct was the act of appellant who, then knowing she was under the influence of alcohol, personally placed her less than three-month-old baby in the bed to sleep between herself and the male co-defendant who she also then knew was "intoxicated," "buzzing," "disoriented," and "high." (This act being done even though she was aware, pursuant to the safety agreement she previously had executed, that her baby's safety was placed in jeopardy by being in her possession while she had been drinking.)

The state of mind underlying the offense of which appellant was convicted did not require criminal intent; rather the offense could be and was accomplished by an act of criminal negligence. OCGA § 16-2-1. Criminal negligence has been properly defined as " 'reckless conduct such as shows an indifference to the injurious results of a negligent act, and indifference to the safety of others, and a lack of consideration for their welfare.' " *Lewis v. State*, 180 Ga. App. 369, 371 (3) (349 SE2d 257). The underlying unlawful act of reckless conduct averred against appellant in the involuntary manslaughter charge was that the appellant "did, while in a drunken state, take the child from the safety of a babysitter and place the child in the bed with the [two] accused. . . ." Contrary to the dissent's contention, the negligent conduct here averred perforce included the drunken state of the actor at the time when the baby was placed in the bed between the two accused; the state of intoxication of the two accused was an inextricable part of appellant's criminally negligent act. Appellant's drunkenness cannot be shunted aside under a claim that it constitutes mere status.

"[T]he State's obligation was to show that [(1)] [appellant, in

committing this averred unlawful act,] *consciously* disregarded a substantial and unjustifiable *risk* that [her] conduct would cause harm or endanger the safety of another person[, said person being a baby less than three months old,] *and* [(2)] that such disregard constituted a *gross deviation* from the standard of care which a reasonable person would exercise in the situation." (Emphasis supplied.) *Turnipseed v. State*, 186 Ga. App. 278, 280 (2) (367 SE2d 259). This conscious disregard was accomplished at the moment when the intoxicated appellant placed her three-month-old baby in bed so that it would be defenselessly lying between herself and the co-defendant who was known to her at the time to be intoxicated to the point of being disoriented and high.

The Southwest Medical Examiner, Division of Forensic Sciences, GBI, gave the following expert testimony regarding these so-classified child "overlay" cases: "Based on my experience with these type of cases, . . . there is usually not an intent. Usually, the baby is laying in bed with adult sized individuals, and these individuals are either intoxicated or morbidly obese and have overlaid the child without realizing the child is beneath them. . . . *[I]n most of these instances, the main primary things are intoxication*, whether it's alcohol or drugs, and morbid obesity are the two main factors. I don't remember any cases being discussed about a heavy sleeper because a baby is going to be moving. Most of us [are] aware what's around us when sleeping with babies and realize[ ] that they're there." (Emphasis supplied.) He also testified, based on his experience, that the sense of awareness, judgment, and physical skills of intoxicated people are less than when they are sober. This expert testimony, viewed in the light most favorable to the verdict and in conjunction with the other admissible evidence of record, is sufficient to support a jury finding a "conscious disregard" from the act of placing a baby, less than three months old, in a bed so that it would be between the two intoxicated and subsequently sleeping adults. In this regard, there exists sufficient evidence from which the jury could determine that this act of the appellant constituted an inherently risky act with the identifiable consequence and that, at the moment the act occurred (that being the moment the child was positioned in the bed by appellant), it was reasonably foreseeable (identifiable) *to appellant* that "a substantial and unjustifiable risk" of an overlay incident existed, thus endangering the safety of the baby. It was *further* a matter for jury resolution whether such a conscious disregard constituted a *gross deviation* from the standard of care which a reasonable person would exercise in the situation. See also *Cowan v. State*, 218 Ga. App. 422 (461 SE2d 587). Moreover, as the "conscious disregard" arose at the moment the child was positioned in the bed, it is of no relevance regarding appellant's culpability that she and her co-defendant were

asleep when the resulting act of fatal overlay occurred.

Accordingly, there exists ample evidence, under a *Jackson v. Virginia* standard, to sustain appellant's conviction of involuntary manslaughter as such offense was averred. While we have the greatest sympathy for appellant's plight, this Court "must interpret the law and apply it with an even hand; the appellate process affords us no latitude to make adjustments for the ill-earned good fortune of the lucky or[, as in this case,] the heart-rending misfortune of the unlucky." *Floyd S. Pike Elec. Contractors v. Williams*, 207 Ga. App. 86, 89 (2) (e) (427 SE2d 67).

2. The State was allowed, over appellant's objection, to impeach Gilliard with a statement of the witness recorded two days prior to trial by the prosecution. The prosecutor claimed that the recorded statement was a work product and the trial court overruled appellant's objection. Under Title 17, Chapter 16, OCGA, the recorded statement does not qualify for a work product exception, as it was a statement within the meaning of OCGA § 17-16-1 (2) (A) and did not merely constitute "notes or summaries made by counsel" within the meaning of OCGA § 17-16-1 (2) (C). See generally *Forehand v. State*, 267 Ga. 254, 256 (3) (477 SE2d 560). However, appellant did not request a continuance; the only remedy requested by appellant was that the prosecutor not be allowed to examine the witness over his prior statement. Appellant made no attempt at trial to assert how she would be prejudiced and made no claim that the prosecution was acting in bad faith. The sanction of evidence exclusion is severe and can be imposed only "where there has been a [timely] showing of prejudice to the defense and bad faith by the State." *Tucker v. State*, 222 Ga. App. 517, 518 (3) (474 SE2d 696); OCGA § 17-16-1; see *Bell v. State*, 224 Ga. App. 191 (480 SE2d 241). The purpose of requiring this showing when the objection is made is to allow the trial court to fashion a remedy that will restore to the defendant the discovery rights provided by the legislature. See generally *Hammitt v. State*, 225 Ga. App. 21, 23-25 (482 SE2d 437) (Blackburn, J., concurring specially). While a continuance of proper length, coupled with the right to recall the witness, would have restored such rights to appellant, appellant elected not to request this relief. Id. at 25. " 'In no case will the trial judge's ruling be reversed for not going further than requested.' " *Lyon v. State*, 262 Ga. 247, 249 (3) (a) (416 SE2d 523). This enumeration is without merit.

3. The trial transcript is replete with admissible evidence that appellant suffered from an acute alcohol problem prior to the death of her child. This evidence had some relevance to establish circumstantially both appellant's indifference to the injurious results of her reckless conduct and her indifference to the safety of her baby at the time of her act; evidence as to the nature and extent of her alcohol

problems also had some relevance circumstantially to establish that her conduct was in conscious disregard of a substantial and unjustifiable risk of an overlay incident. Moreover, this circumstantial evidence was relevant to establish her severe pattern of alcohol abuse and her knowledge of her problem and of the danger it could pose to her baby. Cf. *Bohannon v. State*, 208 Ga. App. 576, 580 (2) (d) (431 SE2d 149). " 'If evidence is relevant and material to an issue in a case, it is not inadmissible because it incidentally puts the defendant's character in issue.' " *Norman v. State*, 197 Ga. App. 333, 336 (4) (398 SE2d 395). " '[T]he Georgia rule favors the admission of any relevant evidence, no matter how slight its probative value. Evidence of doubtful relevancy or competency should be admitted and its weight left to the jurors.' " Id. The trial court did not abuse its discretion in admitting the safety plan or evidence of appellant's alcohol problems existing prior to the baby's death.

4. The admission of similar transaction evidence regarding incidents of appellant's public drunkenness following the death of her child did not meet the standards of admissibility set forth in *Williams v. State*, 261 Ga. 640 (409 SE2d 649). However, the trial transcript is replete with admissible evidence regarding appellant's pattern of alcohol abuse prior to and at the time of her baby's death, including that she had attended a program at Midstep for alcoholics, had been to (Habira) Detox, and had attended AA meetings. The transcript also revealed that appellant's second cousin, who was a licensed practical nurse, had reported appellant due to the cousin's deep concern for the welfare of the child. This cousin had once suffered from alcohol problems and recognized the danger it posed. DFCS responded to this report, and a safety plan was developed to protect the child. This plan, signed by appellant, in part stated: "[Appellant] admits to have an addiction to alcohol. [She] will work towards sobriety." It further stated: "[Appellant] will inquire about addiction classes at Mental Health by July 2/96 . . .; [she] will continue to seek medical attention for infections and liver disorder . . .; and [appellant] will notify worker of when she is to begin addiction classes by July 15/96."

In view of the unrebutted, cumulative and admissible evidence of appellant's pattern of alcohol addiction and abuse, it is highly probable that the inadmissible evidence of appellant's drunkenness, occurring after the death of the baby, did not contribute to the verdict. Accordingly, the error was harmless. Compare *Tuggle v. State*, 211 Ga. App. 854, 857 (2) (d) (440 SE2d 740); cf. *Stirrat v. State*, 226 Ga. App. 350, 352 (2) (b) (486 SE2d 640); *Bohannon*, supra at 580 (2) (d).

5. Appellant objected to the admission of certain photographs of the deceased infant. The State subsequently elected to introduce only

three of the photographs. These photographs were taken prior to the baby's body being received at the autopsy room and depicted the baby's body with a taped tube inserted in its mouth and certain monitoring cables affixed on its chest; the photographs do not reveal that the body had been subjected to any form of surgical invasion. The medical expert utilized these photographs while giving medical testimony regarding the cause of death; he also testified that in his opinion the manner of death was accident and that he did not observe any evidence of chronic abuse of the baby. We find that the photographs were relevant to aid the jury in understanding the testimony of the medical expert. "[E]ven though pre-autopsy photographs are duplicative and may inflame the jury, if the photographs are relevant and material to any issue in the case, they are admissible." *Thomas v. State*, 259 Ga. 202, 204 (4) (378 SE2d 686). The trial court did not abuse its discretion in the admission of these three photographs. Compare *Brown v. State*, 260 Ga. 153, 157 (6) (391 SE2d 108) (photo of decomposing body with animal and insect infestation of face admissible where relevant to issue in case).

*Judgment affirmed. Andrews, C. J., Pope, P. J., Johnson and Blackburn, JJ., concur. Ruffin and Eldridge, JJ., dissent.*

ELDRIDGE, Judge, dissenting.

The death of Mary Bohannon's baby was a tragedy. Her continued prosecution for that death is, to my mind, a travesty. As a matter of law, the evidence in this case can *never* be sufficient to sustain Bohannon's conviction for the offense as indicted.

If it is legal to sleep with one's baby, which it is, it cannot be illegal to sleep with one's baby after drinking alcohol. Drinking alcohol is itself a legal act and cannot make a crime out of another legal act, unless the legislature specifically provides for it. See OCGA §§ 40-6-391 (driving under the influence of alcohol); 16-11-41 (public drunkenness).

It is irrelevant that Bohannon signed the DFCS "safety plan." Bohannon cannot be prosecuted for violating the DFCS safety plan. It is not against the law.

The plan is being used to bootstrap Bohannon's actions into the State law offense of "reckless conduct." In the majority opinion, proof of the essential elements of "reckless conduct" is totally dependent upon proof that Bohannon violated the safety plan. As the majority puts it, Bohannon's act of putting the baby in the bed "was being done even though she was aware, pursuant to the safety agreement she previously had executed, that her baby's safety was placed in jeopardy by being in her possession while she had been drinking." Therein lies the selective prosecution of Mary Bohannon. Another person who did the same act would not be prosecuted because she did

not sign a plan, i.e., she was without the requisite "awareness." In Georgia, an act is not designated as a crime depending upon *who* commits it. Our criminal laws do not work that way.

In reality, swayed by public outrage over the death of the baby, Mary Bohannon was prosecuted for being an *alcoholic* parent. This becomes apparent to anyone who conducts more than a cursory reading of the majority opinion. Her prosecution as an alcoholic parent is the reason why:

(a) Two "similar transactions" which demonstrate only, as the majority puts it, Bohannon's "public drunkenness," are considered harmless. *After* the baby's death, Bohannon twice became extremely intoxicated, once passing out by the side of the road and once having to be forcibly removed from another's home. These two incidents showed absolutely nothing about the indicted act; had nothing to do with parenting or acts toward the baby; occurred *after* the baby's death; and were completely inadmissible under *Williams v. State*, 261 Ga. 640 (409 SE2d 649) (1991). But the majority finds the incidents "harmless." Why? Because the incidents show "appellant's pattern of alcohol addiction and abuse," of which the record was already "replete." This is reversible error in itself.

(b) The majority finds it appropriate that the trial transcript is filled with "evidence that appellant suffered from an acute alcohol problem." However, Bohannon was not indicted for having "an acute alcohol problem." This evidence showed nothing about the indicted *act* of *sleeping* with her baby while intoxicated. Presumably, one who does *not* have an acute alcohol problem, but sleeps with her baby while intoxicated, will also be prosecuted therefor. Presumably. Thus, this evidence was simply inadmissible character evidence. Its admission was reversible error.

(c) The majority finds that the DFCS safety plan provided the requisite notice as to the dangerous *act* that Bohannon "consciously disregarded," i.e., drinking. According to the majority, the plan showed Bohannon's "knowledge of her problem [drinking] and of the danger it [drinking] could pose to her baby." Under the majority's analysis, the plan put Bohannon on notice that *any* act toward the baby was "reckless conduct," if she had been drinking. In other words, "Of course she knew she shouldn't sleep with the baby after drinking. She signed the plan! She knew she shouldn't be around the baby *at all* after drinking." Accordingly, the State was relieved of the burden of proving Bohannon's conscious disregard of any *specific* act, including the indicted act. This is reversible error.

(d) The majority finds that the testimony of the Southwest Medical Examiner provides sufficient evidence of a "conscious disregard" of the results of sleeping with one's baby while intoxicated. The medical examiner testified as to his *personal* experience with intoxication

in "overlay" cases. However, *his* personal experience demonstrates nothing about *Bohannon's* "conscious disregard" of the indicted act. This is reversible error.

(e) The majority opinion makes reference to Bohannon as an alcoholic parent no less than 26 times throughout, but the majority declines to address alcoholism as a *status* that cannot provide a basis for prosecution, absent specific legislation to that effect. *Robinson v. California*, 370 U. S. 660 (82 SC 1417, 8 LE2d 758) (1962); *Grimes v. Burch*, 223 Ga. 856 (159 SE2d 69) (1968); cf. *Powell v. Texas*, 392 U. S. 514 (88 SC 2145, 20 LE2d 1254) (1968).

In short, the majority finds the crime in the actor, not the act. Bohannon can sleep with her baby, she just cannot *be* drunk and sleep with her baby. However, our criminal laws do not work in that way, either.

"No greater good could be done than by withdrawing emotion as a force from the administration of justice." Bleckley, C. J., 9 Ga. Bar Assn. Annual Report, pp. 54, 61 (1887). For now, an act of "parenting under the influence" that results in injury may not be penalized by styling it "reckless conduct." The essential elements of reckless conduct must be present: (1) proof of the commission of a specific *act which is inherently dangerous in itself*, whether or not injury has occurred; and (2) proof of the defendant's conscious disregard of the specific, identifiable danger inherent in doing the *act*.[1] *Daniels v. State*, 264 Ga. 460, 464 (448 SE2d 185) (1994). Herein, these essential elements simply are not present.

Following hard on the heels of *Hall v. State*, 268 Ga. 89 (485 SE2d 755) (1997), this case has followed "the traditional jurisprudential course" discussed by Justice Carley in his dissent thereto. Id. at 95. The evidence is in and the sufficiency thereof available for analysis in light of the expressed concerns. The state law offense of "reckless conduct" has become a catchall crime, wherein the State may reach conduct that it just does not like.

Meanwhile, if indeed Mary Bohannon is suffering from, as the majority puts it, "the heart-rending misfortune of the unlucky," her current misfortune is in this Court's refusal to recognize a basic, childhood tenet: the exercise of two legal rights does not make a wrong. Even if the unintended result of that exercise may be tragic. Whether one approves or not, Bohannon had a legal right to drink, and she had a legal right to sleep with her baby. The legislature may

---

[1] An *act's* inherent dangerousness, in and of itself, and its obvious, foreseeable consequences provide the requisite "notice" to the citizens of this state that such act may have criminal liability as "reckless conduct," *regardless of whether injury occurs. Hall v. State*, 268 Ga. 89 (485 SE2d 755) (1997); *Conyers v. State*, 260 Ga. 506 (397 SE2d 423) (1990); *Horowitz v. State*, 243 Ga. 441 (254 SE2d 828) (1979).

make her specific act a crime. This Court cannot.

Mary Bohannon's conviction should be reversed. I dissent.

I am authorized to state that Judge Ruffin joins in this dissent.

DECIDED FEBRUARY 27, 1998

*Benson, Phillips & Hoffman, Herbert W. Benson*, for appellant.

*C. Paul Bowden, District Attorney, Gregory A. Clark, Assistant District Attorney*, for appellee.