# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4013-21

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

     Plaintiff-Respondent,

v.

E.M., K.G., and L.G. (dismissed
from litigation),

     Defendants,

and

J.C.,

     Defendant-Appellant,

_____

IN THE MATTER OF E.CM.,

     Minor.

_____

Submitted April 23, 2024 – Decided May 6, 2024

Before Judges Enright and Whipple.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Passaic County, Docket No. FN-16-0053-20.

Jennifer Nicole Sellitti, Public Defender, attorney for appellant (Beth Anne Hahn, Designated Counsel, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Janet Greenberg Cohen, Assistant Attorney General, of counsel; Mary L. Harpster, Deputy Attorney General, on the brief).

Jennifer Nicole Sellitti, Public Defender, Law Guardian, attorney for minor (Meredith A. Pollock, Deputy Public Defender, of counsel; Noel C. Devlin, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant, J.C. (Juan)[1] appeals from the Family Part's July 15, 2022 order finding he abused or neglected his daughter, E.CM. (Ella), born in October 2018, pursuant to N.J.S.A. 9:6-8.21(c). No findings were made against Ella's mother E.M. (Erin), Ella's babysitter K.G. (Kelly), or Kelly's daughter L.G. (Lila), and they are not parties to this appeal.

Erin and then-ten-month-old Ella were living in a room in Kelly's home for eight months, when, on August 26, 2019, Erin left Ella in Kelly's care and

---

[1] Because the parties have the same initials, we use pseudonyms for ease of reference.

went to work at 5:30 p.m. Kelly was a licensed daycare provider and regularly provided care for Ella while Erin worked overnight. Juan did not live at that home.

Erin bathed Ella before she left and did not see any marks or bruises on her at that time. Ella was moving her arms normally and appeared "fine." That evening, Ella continued to behave as she typically would—she was happy, walked around, and had no difficulty moving or lifting her arms. At about 8:00 p.m., Juan arrived at the home and saw Ella in her crib. He described Ella as "grumpy" because she did not want to watch what Kelly's nephew was watching on the television. Juan then left to run an errand for Kelly. He later confirmed to the Passaic County Prosecutor's Office (PCPO) that, when he left, Ella remained in the crib and was "fine." Around 9:00 p.m., Kelly gave Ella a bath; Ella splashed the water and had no marks or bruises on her. Kelly placed Ella on Erin's bed with a bottle, which Ella held with two hands. Kelly watched Ella in the bedroom until Juan came back at about 10:00 p.m. and took over Ella's care.

Although Ella had a crib, Juan left her on the bed and lay down next to her to sleep. The next morning, at about 4:30 a.m., Juan called Kelly to watch Ella because he needed to leave for work. Juan told Kelly Ella had been restless

3

and crying all night.  Kelly lay down with Ella in the bed and noticed she was hot and whining.  She gave Ella Tylenol, but this did not help.  Thinking Ella might be hungry, Kelly made her a bottle.  Although Ella usually reached eagerly for her bottle and held it with both hands, that morning she reached out only with her right hand and then did not feed very long.  Her left arm remained lying on the bed.  Kelly tried changing Ella's diaper, but Ella still would not feed.  Kelly lay down with Ella again, and they both slept until 6:00 a.m., when Kelly got up and asked her daughter Lila to watch Ella.

When Erin returned home from work shortly thereafter, Ella was lying on her stomach on the bed.  Erin noticed she was not her usual happy self.  Instead, she looked at Erin "in a pouty way," appeared lethargic, and whined.  When Erin picked her up, Ella's arm was hanging down oddly.  Erin gave her a bottle, which Ella picked up with only one hand, contrary to her usual custom of using both hands.  When Erin touched Ella's left arm, Ella started to cry.  Erin then examined Ella more closely and saw red marks that appeared to be scrapes on her chest, and a bruise on her forehead.  Erin and Kelly took Ella to St. Joseph's Regional Medical Center, where x-rays revealed a fracture of her left humerus, the bone in her upper arm.  The hospital contacted the Division of Child

A-4013-21

Protection and Permanency (Division). The Division referred the case to the PCPO.

When Juan arrived at the hospital, he admitted he might have "squished" Ella while he was sleeping because he slept deeply and did not feel or remember anything. At the hospital, he argued with Erin and twice yanked Ella out of Erin's arms so he could hold her.

Two days later, Detective Kristin Falotico of the PCPO interviewed Juan, who confirmed that Ella was "fine" when he arrived at Kelly's home on August 26. He further confirmed he had no concerns for Kelly's care of Ella since Ella had "never had a bump or anything" while in Kelly's care. Instead, Juan speculated Kelly's nephew had caused Ella's injuries, although Juan had not seen him hurting Ella and could not say how the injuries occurred.

Division investigator Tamika Jones followed up and interviewed Juan, who again confirmed Ella was "fine" when he took over her care and repeated his admission he might have rolled onto Ella while he was sleeping. Juan also admitted to marijuana use and agreed to attend a substance abuse assessment and parenting evaluation. Both Erin and Kelly expressed concern to Jones that Juan was too rough with Ella. Kelly reported she had seen Juan grab Ella by her legs and hold her upside down. The Division initiated a safety protection plan

5

that barred Juan and Kelly from unsupervised contact with Ella and memorialized Juan's agreement to be evaluated.

On November 6, 2019, the trial court granted the Division care and supervision of Ella and restrained Juan, Kelly, and Lila from unsupervised contact with her. The Division completed its investigation and substantiated Juan and Kelly for physical abuse and inadequate supervision. The Division made a finding of "not established" against Lila, and the court dismissed her from the litigation on December 5, 2019.

The court held a fact-finding trial. Because both Juan and Kelly had been substantiated, the Division initially intended to utilize a burden-shifting strategy. In light of the recently decided New Jersey Division of Child Protection and Permanency v. J.R.-R., 248 N.J. 353 (2021), however, the Division revisited their investigation and determined the finding against Kelly should more properly be "not established." The Division then sought a Title 9 finding only against Juan. Because the Division had not completed changing their internal records to reflect the new finding at the time of trial, the investigation summary provided as evidence reflected both Juan's and Kelly's substantiation. Kelly remained in the litigation so she could contest the process if issues arose.

A-4013-21

During the trial, Tamika Jones testified about her investigation of the August 27, 2019 referral. Jones stated she spoke with Erin, Juan, and Kelly and watched the recordings of their interviews by the PCPO; none of them provided an accidental explanation for Ella's injuries. Erin reported to Jones that Juan was verbally aggressive, although she denied any domestic violence. While he speculated Kelly's nephew might have injured Ella, Juan stated, at the time he took over her care in the evening, Ella was behaving normally, and he did not observe any injuries. Jones confirmed Juan admitted he was the only person caring for Ella between 10:00 p.m. on August 26 and 4:00 a.m. the next morning, and he had slept with her in the bed and might have "squished" her arm or rolled over on her. He denied smoking marijuana that evening but admitted he usually smoked "one blunt" in order to fall asleep.

Jones also testified the Division changed Kelly's initial substantiation because even Juan admitted there had never been any concerns with her care of Ella or any other child she babysat. After Jones watched the PCPO's interviews of Lila and Kelly's nephew, she determined there was insufficient evidence either of them had injured Ella.

Madesa Espana, MD, Chief of the Child Protection and Safety Center at St. Joseph's, testified about her examination of Ella and review of Ella's medical

records. Without objection, the court qualified her as a pediatric physician with expertise in child abuse and neglect cases. As part of her review, Dr. Espana completed a physical exam of Ella in the emergency room on August 27, 2019, and interviewed Erin and Juan.

At that time, Ella had limited range of motion in her left arm and the slightest movement caused her pain. She had fresh semicircular and linear abrasions on her chest that appeared to be scratch marks or nail marks. Dr. Espana confirmed the Division's photograph of Ella's injuries accurately depicted those marks. Dr. Espana opined such abrasions could be caused by pressure or rubbing of the skin, but Ella could not have made the marks herself, as they were too long to have been made by her fingernails. And, while the injuries could have been accidental, no one had provided Dr. Espana with an explanation regarding how Ella's injuries were accidently inflicted. Dr. Espana also could not tell when Ella bruised her forehead, but opined the bruise was most likely caused by Ella's forehead hitting a surface, although no information was provided about any such incident. Additionally, Dr. Espana stated a CAT scan showed a small area of bleeding on the surface of Ella's brain, which could be caused by a fall, by being shaken, or by an incident such as a car accident.

A-4013-21

X-rays of Ella taken at the hospital revealed her fractured left humerus. Follow-up x-rays in September 2019 showed the fracture healing, which confirmed the injury had been recent when the first x-rays were taken in August. The break was an oblique fracture, also called a spiral fracture, caused by the bone being twisted and bent. Dr. Espana confirmed the humerus is "quite strong and not easy to break," and breaking it would have caused Ella immediate pain. According to Dr. Espana, Ella could not have created the "significant force" needed to cause this break because ten-month-old children, "don't fracture their extremities based on their just regular activities."

Dr. Espana also reviewed Ella's medical records, including those from her pediatrician and the hospital. She found nothing in these records, or the hospital laboratory reports, to explain Ella's injuries. Dr. Espana considered possible medical causes for the broken bone, but Ella showed no signs of any genetic or metabolic condition, such as fragile bone disease, so she ruled out these causes. Dr. Espana testified the fracture was "highly concerning for an inflicted or abusive injury" because Ella's caretakers had not provided an account that would explain it, Ella could not have caused it on her own, and there was no medical explanation. Falling from the crib or having an adult roll over and "squish" her were possible explanations for Ella's broken humerus, while squeezing was not.

9

The Division also called Kelly, who testified about the events of August 26 and 27, 2019. Kelly confirmed she had been a licensed caregiver for eight or nine years, during which time no allegations of abuse or neglect were ever made against her.

Kelly testified that, on August 26, no one had been alone with Ella besides Juan. Contrary to Juan's statements to the PCPO, Kelly testified Ella had been awake and drinking her bottle when Juan took over her care. At the time, she was able to move both her arms, and "[s]he was perfect." Kelly testified that Ella was hot and "uneasy" when she took over her care from Juan at 4:30 a.m. on August 27. She tried feeding Ella and changing her diaper, but Ella would not feed and remained "uneasy" and was "crying a little bit." Ella attempted to grab the bottle with her right hand while "she just left [her left hand] . . . on the bed." Kelly did not notice any marks on Ella's abdomen when she changed her diaper because the room was dim, and she did not lift up Ella's shirt. Kelly denied anything had occurred while she cared for Ella that could have caused the injuries. She also confirmed Juan stated at the hospital that, when he sleeps, "he doesn't feel anything that he does."

Although Juan's attorney reported receiving approval for an expert, he did not present any witnesses or evidence.

The Law Guardian supported the Division's request for a Title 9 finding against Juan.

On July 15, 2022, the judge issued an oral opinion and order, finding by a preponderance of the competent, material, and relevant evidence that Juan had abused or neglected Ella under N.J.S.A. 9:6-8.21(c). The litigation was dismissed that same day. This appeal followed.

On appeal, Juan argues his conduct was not grossly negligent, and the court relied on incompetent testimony and impermissibly served as an expert, turning Title 9 into a strict liability statute. He also argues the trial court misapplied the principles enunciated in J.R.-R.

We review the factual findings and conclusions of a trial judge with "deference to the trial court's credibility determinations and its feel of the case based upon the opportunity of the judge to see and hear the witnesses." N.J. Div. of Youth & Fam. Servs. v. A.R.G., 361 N.J. Super. 46, 78 (App. Div. 2003) (citing Cesare v. Cesare, 154 N.J. 394, 411-12 (1998)). We likewise "defer to the trial court's assessment of expert evaluations." N.J. Div. of Youth & Fam. Servs. v. H.R., 431 N.J. Super. 212, 221 (App. Div. 2013) (citing In re Guardianship of D.M.H., 161 N.J. 365, 382 (1999)). In addition, "[b]ecause of the family courts' special jurisdiction and expertise in family matters, appellate

courts should accord deference to family court factfinding." Cesare, 154 N.J. at 413. We should not disturb the trial judge's findings unless they are "so manifestly unsupported by or inconsistent with the competent, relevant[,] and reasonably credible evidence as to offend the interests of justice." Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974). On the other hand, a trial court's "interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552-53 (2014) (quoting Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

New Jersey's child welfare laws strike a "balance between two competing interests: a parent's constitutionally protected right 'to raise a child and maintain a relationship with that child, without undue interference by the state,' and 'the State's parens patriae responsibility to protect the welfare of children.'" N.J. Div. of Youth & Fam. Servs. v. A.L., 213 N.J. 1, 17-18 (2013) (first quoting N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 102 (2008), then quoting N.J. Div. of Youth & Fam. Servs. v. K.H.O., 161 N.J. 337, 347 (1999)). Of those laws, Title 9 aims to "protect children 'who have had serious injury inflicted upon them' and make sure they are 'immediately safeguarded from

12

further injury and possible death.'" Id. at 18 (quoting N.J.S.A. 9:6-8.8(a)). "The law's 'paramount concern' is the 'safety of the children' and 'not the culpability of parental conduct.'" Ibid. (first quoting N.J.S.A. 9:6-8.8(a), then quoting G.S. v. N.J. Div. of Youth & Fam. Servs., 157 N.J. 161, 177 (1999)). With that focus in mind, Title 9 states a child is abused or neglected when that child's

> physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian, as herein defined, to exercise a minimum degree of care . . . in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment; or by any other acts of a similarly serious nature requiring the aid of the court.
>
> [N.J.S.A. 9:6-8.21(c).]

Juan argues the trial court erred in determining his co-sleeping with his ten-month-old daughter was grossly negligent within the meaning of Title 9. He asserts, in doing so, the trial judge "speculate[d] and fill[ed] in missing gaps because the State failed to offer any evidence or testimony whatsoever demonstrating co-sleeping poses an imminent risk of substantial harm." Juan further contends the State did not address in its case "what Juan, as an ordinary person, understood about the risks of co-sleeping." According to Juan, "[t]hose requisite evidential links are missing." He offers several independent medical

sources, not provided at trial, to argue that co-sleeping is not grossly negligent. In his reply brief, he clarifies these studies are not offered as proof that any particular stance is correct, but to emphasize "the proposition that there exist[] considerable differences of opinion and varying considerations on the topic of co-sleeping." Also on reply, Juan emphasizes the trial court "had no particularized evidence before it establishing what it found to be reckless conduct as a matter of law."

The trial judge found Juan "admitted to sleeping in the same bed with the child on the evening in question and even stated that perhaps he rolled over and squished the child's arm." In comparing Juan's admitted actions to those found grossly negligent in N.J. Div. of Youth & Fam. Servs. v. A.R., 419 N.J. Super. 538 (App. Div. 2011), the judge explained "[A.R.'s] actions in placing a child, a [ten]-month-old child, on a twin bed without railings next to an operating radiator and with another sleeping child were deliberate. And the events that followed, although not intended by defendant, were not brought about by accidental means." Explaining the phrase "not brought about by accidental means," the trial judge cited G.S., 157 N.J. at 175, and stated our Supreme Court "held that, ['w]here an action is deliberate, the actor can or should foresee that

his conduct is likely to result in injury as a matter of law, that the injury is caused by['] 'other than accidental means.'"

Further, the trial judge referenced our holding in A.R., stating:

> If an intentional act produces an unintended result, the injury is not accidental. A parent or guardian can commit child abuse even though the resulting injury is not intended. [The Division] and the courts must examine the circumstances leading up to the injury to determine whether it was caused by accidental means. The intent of the parent or guardian is irrelevant.
>
> [A.R., 419 N.J. Super. at 543 (quoting G.S., 157 N.J. at 175).]

The judge then acknowledged "not every physical injury caused by other than accidental means falls within the parameters of [N.J.S.A.] 9:6-8.21(c)," (quoting A.R., 419 N.J. Super. at 544), and that failure "to exercise a minimum degree of care . . . refers to conduct that is grossly or wantonly negligent but not necessarily intentional," (internal quotation marks omitted). Addressing the "minimum degree of care" standard, the trial judge again relied on the Supreme Court's analysis in G.S. to state:

> [c]onduct is considered willful or wanton if . . . done with the knowledge that injury is likely to or probably will result. . . . Because risks that are recklessly incurred are not considered unforeseen perils or accidents in the eyes of the law, actions taken with reckless disregard for the consequences also may be wanton or willful. . . .

A-4013-21

[G.S., 157 N.J. at 178 (citations omitteed).]

Finally, the trial judge summarized the applicable standard as "[w]here an ordinary, reasonable person would understand that a situation poses dangerous risks and acts without regard for the . . . potentially serious consequences, the law hold[s] him responsible for the injuries he caused."  (Quoting id. at 179).

With that framework established, the judge stated, "[c]ommon sense dictates that a [ten]-month-old child should not be sleeping on a bed with an[] adult who could unconsciously roll over and squish or even suffocate the child, causing serious injury or even asphyxiation," and therefore the Division proved its case by a preponderance of the evidence.

In a Title 9 action, "prima facie evidence that a child . . . is an abused or neglected child" is provided by proof (1) of "injuries sustained by a child or of the condition of a child," and (2) that those injuries or condition are "of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or guardian."  N.J.S.A. 9:6-8.46(a).  In New Jersey Division of Child Protection & Permanency v. J.R.-R., our Supreme Court expanded on the statutory language, explaining "if the injury is one that ordinarily would not occur in the absence of abuse or neglect, if the child was under the supervision of a parent, and if there is no indication the injury was the

result of a mere accident, then [the Division] has presented prima facie evidence of abuse or neglect." 248 N.J. at 371.

Here, the trial court's legal analysis was largely an accurate synopsis of the current case law, but its conclusion resulted from the mistaken application of what is meant by "other than accidental means," notwithstanding a lack of proof the child's injuries were "of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or guardian." See N.J.S.A. 9:6-8.46(a).

The trial judge explained the phrase "other than accidental means," by misquoting the holding in G.S. to state, "[t]he G.S. Court . . . held that, ['w]here an action is deliberate, the actor can or should foresee that his conduct is likely to result in injury as a matter of law, that the injury is caused by' 'other than accidental means.'" (citing G.S., 157 N.J. at 175). The actual quote from G.S., however, states that "[w]here an action is deliberate, and the actor can or should foresee that his conduct is likely to result in injury as a matter of law, that injury is caused by 'other than accidental means.'" 157 N.J. at 175 (emphasis added).

Ordinarily, the omission of one word in an oral decision is not dispositive, but here, the omission of the single word—"and" in the above quote—changed the definition of the phrase, "other than accidental means," from having two

17

conditions—in the Supreme Court's version—to having one—in the trial judge's interpretation. [2] The trial judge's subsequent discussion then omitted any analysis to support the finding that "it was reasonably foreseeable that [Juan's] conduct was likely to cause injury."

Secondly, a prima facie case that a child is abused or neglected requires proof, by a preponderance of the evidence, that a child's injury or condition is "of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or guardian." N.J.S.A. 9:6-8.46(a). This element is entirely absent from this case. During her testimony, Dr. Espana testified the characteristics of Ella's injury were "highly concerning for an inflicted or abusive injury." The Division caseworker testified the claim of abuse against Juan was substantiated "based on the absolute circumstances that the child was hospitalized. She had . . . an inflicted injury and she required medical attention," and the Division relied on "interviews with . . . the family, [including the m]other[]" to determine "there was a concern, that they thought

---

[2] In the trial judge's analysis, merely finding the "action is deliberate" was sufficient to then presume that "the actor can or should [have] foresee[n] that his conduct [wa]s likely to result in injury as a matter of law." In the G.S. framework, however, an action is caused by "other than accidental means" when it is both deliberate and "the actor can or should foresee that his conduct is likely to result in injury as a matter of law." G.S., 157 N.J. at 175.

that, you know, [Juan] could've caused the injury." None of this testimony was sufficient to prove by a preponderance of the evidence that Ella's injuries were "of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or guardian." See N.J.S.A. 9:6-8.46(a).

In his oral opinion, the trial judge found Juan "admitted to sleeping in the same bed with the child on the evening in question and even stated that perhaps he rolled over and squished the child's arm." The judge then found "[c]ommon sense dictates that a [ten]-month-old child should not be sleeping on a bed with an[] adult who could unconsciously roll over and squish or even suffocate the child, causing serious injury or even asphyxiation." In reviewing testimony by the Division's expert, the trial judge made no mention of any testimony regarding the risks or benefits of co-sleeping. The only time the trial judge referred to Juan's culpability, was in finding he "failed to exercise a minimum degree of care and the child was seriously injur[ed] as . . . a direct result . . . of his actions." The trial judge did not address what a "minimum degree of care" would have required under the specific circumstances of the case. Moreover, no evidence was produced at the hearing to support the judge's "common sense" assertion, and the court did not analyze whether Juan "[could] or should [have]

foresee[n] that his conduct [was] likely to result in injury as a matter of law." See G.S., 157 N.J. at 175.

Instead, the trial judge appears to have accepted the Law Guardian's unsupported pronouncement that co-sleeping with a ten-month-old child was gross negligence, when the Law Guardian asserted,

> I mean, sleeping with a ten-month-old child technically is . . . gross negligence, Your Honor, and I believe a child of that age should be put in a crib and will have a separate bed, Your Honor. That's the reason why the Division does not allow a child to sleep with a parent, because when they are in deep sleep, they do[] not know where [the child is] and how [to] . . . move around the child.

No evidence was presented during trial to support the Law Guardian's assertion. Additionally, although the Law Guardian alleged "the Division does not allow a child to sleep with a parent," the Division made no such statement during the case in chief or offer any evidence to support that statement. Instead, the testimony and evidence offered during the fact-finding hearing focused on the questions of "who did what?" and "how bad were the child's injuries?" The Division carried their burden of proving by a preponderance of the evidence that Juan was responsible for Ella's care when she was severely injured. But it did not address—let alone prove—that Juan neglected to show a minimum degree

20

of care in deciding to co-sleep with his ten-month-old daughter before she was injured.

We acknowledge the issue of co-sleeping has been treated differently in our courts nationwide.  Compare State v. Morrison, 233 A.3d 136, 152 (Md. 2020) (finding that a mother's sleeping in a bed with her four-month-old baby and her four-year-old child after drinking approximately four beers was not "a gross departure from what would be expected of an ordinary reasonable person"), with State v. Merrill, 269 P.3d 196 (Ut. Ct. App. 2012) (finding sufficient evidence of actual and perceived risk of co-sleeping with a three-and-a-half-month-old baby when defendant was a heavy sleeper who had lost another child under similar circumstances) and Bohannon v. State, 498 S.E.2d 316, 323 (Ga. 1998) (determining that a "rational trier of fact could find 'conscious disregard' from the fact of placing a baby, less than three months old, in a bed so that it would be between two intoxicated and subsequently sleeping adults" two weeks after the defendant and a child abuse investigator from the State had discussed the threat the former's alcoholism posed to her child).

We, therefore, decline to conclude that co-sleeping is either always grossly negligent, or never grossly negligent.  Instead, as with all child abuse and neglect cases, a defendant's purported culpability in a case where a child

21

may have been harmed while co-sleeping must be determined after careful examination of the factual circumstances in that specific case. In that regard, we note that, in a 2014 decision, we explicitly declined to find that "co-sleeping constitute[d] child abuse or neglect," distinguishing between co-sleeping in general and "co-sleeping with an infant while under the influence of illegal drugs." N.J. Div. of Child Prot. & Permanency v. B.O., 438 N.J. Super. 373, 385 n.4 (App. Div. 2014) (emphasis added).

Here, the record does not address the size of the bed where Juan and Ella slept. Contrast with A.R., 419 N.J. Super. at 545-46 (relying, in part, on the fact a father placed his ten-month-old on a twin bed without railings to find his conduct "amounted to gross negligence and supports" the finding of abuse or neglect). Also, notably, the trial court explicitly "assume[d] [Juan] was sober on the evening in question," yet still found him grossly negligent. Contrast with Morrison, 233 A.3d at 152 (finding that a mother's sleeping in a bed with her four-month-old baby and her four-year-old child after drinking approximately four beers was not "a gross departure from what would be expected of an ordinary reasonable person").

Finally, Juan argues the trial court misapplied the New Jersey Supreme Court's holding in J.R.-R. by "relieving the [Division] of its burden [to prove its

case], admittedly ignoring record evidence, accepting testimony rife with embedded hearsay, and . . . equat[ing] the inferential with the strictly liable." (Citing 248 N.J. 353 (2021)).  He also contends the trial court erred in permitting the Division to change its finding against Kelly from "substantiated" to "not established," "years after it concluded its investigation wherein, as the caseworker would admit at trial, it could not determine who was responsible for the child's alleged injuries."  We disagree.

In our view, the trial court correctly applied the holding in J.R.-R. but, for the reasons we have stated, mistakenly found the Division satisfied its burden pursuant to N.J.S.A. 9:6-8.46(a).  Because the record does not contain sufficient credible evidence to support a finding Juan was grossly negligent, we are constrained to reverse the judge's finding that the Division established Ella was an abused or neglected child.

Reversed.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4013-21